# AMERICAN BAR ASSOCIATION
STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY

**Formal Opinion 92-367**                        **October 16, 1992**
**Lawyer Examining a Client as an Adverse Witness,**
**Or Conducting Third Party Discovery of the Client**

> *A lawyer who in the course of representing a client examines another client as an adverse witness in a matter unrelated to the lawyer's representation of the other client, or conducts third party discovery of the client in such a matter, will likely face a conflict that is disqualifying in the absence of appropriate client consent. Any such disqualification will also be imputed to other lawyers in the lawyer's firm.*

The Committee has been asked whether a lawyer who has a doctor as a general client may cross-examine the doctor when the doctor testifies as an adverse expert witness in a medical malpractice case. The central issue posed by the inquiry--whether a potentially disqualifying conflict of interests arises when the lawyer while representing one client in litigation must deal with another client as a third-party witness--has resonance in an array of familiar situations that go well beyond the particular circumstances prompting the present inquiry. The potential for conflict does not depend on the client being an expert, rather than a fact, witness, nor on the setting being trial rather than pretrial discovery. Nor, indeed, does it depend on testimonial evidence being involved: documentary third-party discovery of a client, on behalf of another client, may well present the same core issue.[1]

The Committee concludes that a lawyer's examining the lawyer's client as an adverse witness, or conducting third party discovery of a client, will ordinarily present a conflict of interest that is disqualifying absent consent of one or both of the clients involved (depending, as will be explained, on the nature and degree of the conflict), and that the individual lawyer's disqualification will, again in the absence of consent, be imputed to all other lawyers in the lawyer's firm as well.

The principal applicable provisions of the Model Rules of Professional Conduct (1983, amended 1992) are to be found in Rule 1.7, dealing with conflicts of interest generally: paragraph (a) of that Rule prohibits representations "directly adverse" to another client, unless the lawyer reasonably believes that

---

1. It is assumed, for purposes of this opinion, that whatever the purposes for which the third party witness-client's evidence is offered or sought, the litigation in which this occurs is not itself adverse to that client.

AMERICAN BAR ASSOCIATION STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY, 541 N. Fairbanks Court, Chicago, Illinois 60611 Telephone (312)988-5300 CHAIR: David B. Isbell, Washington, DC ❑ Daniel Coquillette, Newton, MA ❑ Ralph G. Elliott, Hartford, CT ❑ Lawrence J. Fox, Philadelphia, PA ❑ Margaret Love, Washington, DC ❑ William C. McClearn, Denver, CO ❑ Richard McFarlain, Tallahassee, FL ❑ Truman Q. McNulty, Milwaukee, WI ❑ CENTER FOR PROFESSIONAL RESPONSIBILITY: George A. Kuhlman, Ethics Counsel; Joanne P. Pitulla, Assistant Ethics Counsel
© 1992 by the American Bar Association. All rights reserved.

the lawyer's relationship with that client will not be adversely affected, and both clients consent; and paragraph (b) prohibits a representation that "may be materially limited by the lawyer's responsibilities to another client," unless the lawyer reasonably believes that that representation will not be adversely affected, and the client involved in the representation (but not both clients) consents.[2] Also pertinent are Rule 1.10, governing imputation of a lawyer's disqualification;[3] Rule 1.6, governing the obligation of confidentiality;[4] Rule 1.8(b), which prohibits using information relating to a client's representation to the client's detriment;[5] and the obligations of competence and diligence set forth, respectively, in Rules 1.1 and 1.3.[6]

The applicable provisions of the predecessor Model Code of Professional Responsibility include DR 5-105, which addresses a lawyer's refusing to accept or continue employment if the interests of another client may impair

---

2. The text of Rule 1.7 is as follows:
(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
   (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
   (2) each client consents after consultation.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
   (1) the lawyer reasonably believes the representation will not be adversely affected; and
   (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

3. Rule 1.10 provides in pertinent part:
(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.
   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
(c) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in Rule 1.7.

4. Rule 1.6 provides, with exceptions not here pertinent, that "[A] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation...."

5. Rule 1.8(b) provides that "[A] lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation, except as permitted or required by Rule 1.6 or Rule 3.3."

6. Rule 1.1 provides that "[A] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."
Rule 1.3 provides that "[A] lawyer shall act with reasonable diligence and promptness in representing a client."

the lawyer's independent professional judgment; Canon 5 and EC 5-1, which call upon a lawyer to exercise independent professional judgment on a client's behalf; EC 7-1 and DR 7-101, regarding zealous representation of a client; EC 5-14, 5-15, and 5-16, which deal with a lawyer's responsibilities with respect to the interests of multiple clients; and EC 4-5 and Canon 4, which require preservation of client confidences.

The Committee believes that as a general matter examining one's own client as an adverse witness on behalf of another client, or conducting third party discovery of one client on behalf of another client, is likely (1) to pit the duty of loyalty to each client against the duty of loyalty to the other; (2) to risk breaching the duty of confidentiality to the client-witness; and (3) to present a tension between the lawyer's own pecuniary interest in continued employment by the client-witness and the lawyer's ability to effectively represent the litigation client. The first two of these hazards are likely to present a direct adverseness of interest falling within Rule 1.7(a); all three may constitute material limitations on the lawyer's representation, so as to come under Rule 1.7(b).

At the outset, the Committee notes that if there is a continuing relationship between lawyer and client, even if the lawyer is not on a retainer, and even if no active matters are being handled, the strict provisions governing conflicts in simultaneous representations, in Rule 1.7, rather than the more permissive former-client provisions, in Rule 1.9, are likely to apply.[7]

**Loyalty**

In Informal Opinion 1495 (1982), this Committee stated that the Model Code forbade a lawyer's accepting representation adverse to an existing client even in an unrelated matter. This stricture is clearly set out in Rule 1.7(a).[8] Underlying the ethical prohibition is the precept that the lawyer's duty of loyalty demands that a client not be concerned with whether the lawyer may subconsciously be influenced by the differing interests of another. As the court put it in Estates Theatres v. Columbia Pictures Industries, 345 F.Supp. 93, 99 (S.D.N.Y 1972), an attorney should "not be permitted to put himself in a position where, even unconsciously, he will be tempted to 'soft pedal' his zeal in furthering the interests of one client in order to avoid an obvious clash with those of another."

When a lawyer is called upon to cross-examine her own client, the lawyer may well be torn between a "soft," or deferential, cross-examination, which compromises the representation of the litigation client, and a vigorous one, which breaches the duty of loyalty to the client-witness. The Model Code addressed the issue in terms of the command of Canon 7, that "A lawyer

---

7. See IBM Corp. v. Levin, 579 F.2d 271, 281 (3d Cir.1978) (even though law firm worked on a fee-for-service basis rather than pursuant to a retainer, and had no assignment on hand when the new suit was filed, the "pattern of repeated retainers supports the finding of a continuous relationship" for purpose of application of conflicts rules.)

8. See note 2, supra.

should represent a client zealously within the bounds of the law." The Model Rules have supplanted "zeal" with requirements of competence (Rule 1.8) and diligence (Rule 1.3), but the result is the same. The decisional authority recognizing this conflict, from both courts and ethics committees, is substantial.[9]

**Confidences**

Cross-examination of one's own client may also jeopardize client confidences, in two ways.

First, to the extent a lawyer's general familiarity with how a client's mind works is relevant and useful information, it may also be disqualifying information within the contemplation of Rule 1.8(b), which generally prohibits a lawyer from using information relating to the representation of a client to the disadvantage of the client unless the client consents after consultation.[10]

Second and more obviously, if the lawyer has acquired specific confiden-

---

9. See People v. Rhodes, 12 Cal.3d 180, 524 P.2d 363, 115 Cal.Rptr. 235 (1974) (city attorney with prosecutorial responsibilities should not accept criminal defense appointment; even absent a direct conflict, he might be tempted to temper vigorous advocacy where law enforcement officers with whom he has "close working relationship" are called as witnesses); State v. Reis, 4 Haw.App. 327, 666 P.2d 612 (1983) (criminal defense lawyer's concurrent representation of adverse witness is inherently conducive to divided loyalties and yields a real conflict of interest as a matter of law); Md. State Bar Ass'n, Inc., Comm. on Ethics, Op. 81-73 (1981) (a lawyer who represents a physician in one case may not later represent a different client in a case in which the physician client from the prior case will be called as an adverse witness; the lawyer's ability to conduct a vigorous cross-examination will be impaired, and the lawyer would be unable zealously to represent the second client); see also Bar Ass'n of Nassau County (N.Y.), Comm. on Professional Ethics, Op. 86-46 (1986) (lawyer may not represent a client in one matter who may testify against another client in an unrelated matter; lawyer would be supporting witness's credibility when defending him as the client, but attacking his credibility when advocating for the other client). Compare People v. Pennington, 228 Cal.App. 965, 966, 279 Cal Rptr. 85, 88 (1991) (where a public defender was unaware that his office had previously represented a prosecution witness, defendant could not have been prejudiced) with Commonwealth v. Geraway, 364 Mass. 168, 301 N.E.2d 814 (1973) (criminal defense counsel was similarly unaware that his firm represented certain of the witnesses against the defendant, and his cross-examination of the witnesses had been vigorous; even though there was no Sixth Amendment violation, the court nonetheless, under its supervisory authority and over a strong dissent, reversed the conviction and ordered a new trial).

10. Cf. McCarthy v. John T. Henderson, Inc., 246 N.J.Super. 225, 587 A.2d 280 (App.Div.1991), where a former client was afraid that his lawyer, who was now opposing him, could use this familiarity in a negotiation. The trial court disqualified the law firm, concluding that it had "learned things about [the former client] in terms of his thinking, his decision making process, how he evaluates matters, how he approaches the settlement of or the further prosecution of a claim." The appellate court found the conclusion unwarranted, however, in view of the limited relationship described in the former client's affidavit in support of disqualification. The court noted that the former client did not actually say that the firm had gained any personal information "that arguably would carry over from case to case, regardless of the subject matter."

<u>5 Committee on Ethics and Professional Responsibility</u>    92-367

tial information relevant to the cross-examination, the lawyer may, instead of using it, overcompensate and fail to cross-examine fully, for fear of misusing it, and thereby fail adequately to represent the litigation client.[11]

**The Lawyer's Own Interests**

In addition to the sorts of responsibilities to a client or a third person suggested by the discussion under the two preceding captions, a lawyer's interest in representation of the litigation client in the present circumstances may be limited by the lawyer's own interest in continued business from the client-witness. For a conflict of this sort, unlike the two addressed above, only Rule 1.7(b) would be of potential applicability, since Rule 1.7(a) does not recognize adverseness to the lawyer's interests, but only to those of another client.[12]

**Degree of Adverseness**

It should be emphasized that the degree of adverseness of interest involved--and in consequence whether paragraph (a) or (b) of Rule 1.7, or neither of them, is implicated--will depend on the particular circumstances in which the question arises. We think that in the specific circumstances posed by the inquiry prompting this opinion--cross-examination of a doctor client as an adversary's expert witness--there will almost inescapably be a direct adverseness, under Rule 1.7(a).[13] In such circumstances a lawyer may only proceed if

---

11. See, e.g., Kevlik v. Goldstein, 724 F.2d 844 (1st Cir.1984), where, on the basis of a conflict arising from the potential use of privileged information, civil rights plaintiffs in a false arrest case won disqualification of the municipal defendant's counsel by reason of his firm's brief previous representation, in the underlying criminal case, of a co-arrestee who would be a key plaintiff's witness; United States v. Jeffers, 520 F.2d 1256 (7th Cir.1975) (Stevens, J.), cert. denied, 423 U.S. 1066 (1976), a former-client case in which the court noted that the inherent hesitancy of counsel thoroughly to cross-examine a current client creates a very real conflict of interest (collecting cases); Narel Apparel Ltd. v. American Utex Intern., 460 N.Y.S.2d 125, 92 A.D.2d 913 (1983) (disqualifying plaintiff's attorney for fear that he would have to cross-examine his former clients, who were expected to be defendants' principal witnesses, on confidential matters, giving plaintiff an unfair advantage); Or.State Bar, Legal Ethics Comm., Formal Op. 1991-110 (1991) (lawyer who formerly represented expert witness for the state in criminal trials and who learned of witness's official wrongdoing may not represent criminal defendant against whom former client will be called to testify as expert if it appears that the witness's confidences may be useful in defending the criminal proceeding, unless the former client consents after disclosure); see also State v. Reis, note 9 supra (applying Jeffers to the cross-examination of a former client, court found deprivation of effective assistance where lawyer had apparently taken pains not to use privileged information obtained from one of the witnesses for impeachment or cross-examination, for fear of misusing it).

12. For discussion of this sort of conflict in the former-client context, see Jeffers, 520 F.2d at 1264-65.

13. The argument might be made that the representation of the witness/client is merely a material limitation on representation of the litigation client within Rule 1.7(b) and thus curable, assuming the lawyer reasonably believes the litigation representation will not be adversely affected, upon consent of the litigation client alone. The Committee

the lawyer reasonably believes the relationship with the client on the stand will not be adversely affected,[14] and if both clients consent after consultation.

It will also frequently be the case that a lawyer's taking discovery, whether testimonial or documentary, on behalf of one client, of a third party who is also a client, will present such direct adverseness, so as to be disqualifying under Rule 1.7(a).

Even where the interests are not directly adverse, in the sense that any advantage gained by the lawyer in representation of the litigation client necessarily entails some concrete disadvantage to the client who is in the position of witness or target of third party discovery, the lawyer's representation may be affected by other responsibilities or interests, so as to come under Rule 1.7(b). Such circumstances might be presented, for example, if the second client was a corporate entity, the adverse witness was an officer or employee of that client, and the effect of vigorous cross-examination would likely be to impeach the witness, albeit not to impinge directly upon any interest of the employer client. In such a case, the lawyer might nonetheless have to deal with two possible sources of material limitation on the vigor of the lawyer's examination or discovery: (1) The lawyer's own self-interest might deter the lawyer from alienating the client, from whom the lawyer gets business, by impugning its employee's testimony; (2) more subtly, the lawyer's loyalty to the corporate employer might make the lawyer reluctant to vigorously impeach the employee and thus possibly embarrass the employer. Under Rule

---

believes, however, that at least absent exceptional circumstances, a lawyer will not adequately examine an opposing expert witness without endeavoring to challenge the witness's qualifications and credibility; impugning a client's word or qualifications is directly adverse to that client. See Avacus Partners L.P. v. Brian, Fed.Sec.L.Rep. (CCH) par. 94, 920 (Del.Ch.Ct.1990), 1990 WL 6576, rev'd for lack of standing sub nom. In re Infotechnology, Inc., 582 A.2d 215 (Del.1990), in which the court rejected the law firm's argument that in cross-examining its client on the witness stand, it would not be attacking the client's opinion so much as it would be attacking the sufficiency of the information the client had been given on which to base its opinion.

14. There will be situations in which the lawyer cannot be said to hold a "reasonable belief" that the relationship will not be adversely affected. "Reasonable belief" is defined in the Terminology section of the Model Rules to mean both subjective or actual belief, and "that the circumstances are such that the belief is reasonable." Put another way, depending on the facts, there will be conflicts that are "nonconsentable," just as there will be consents that do not survive a court's examination. As Professor Wolfram notes, "client consent in a nonconsentable conflict case does not forestall either discipline or disqualification." C. Wolfram, Modern Legal Ethics 342 (footnotes omitted) (1986); see United States v. Wheat, 486 U.S. 153 (1988), where the Court refused to permit the lawyer for two co-defendants to represent a third co-defendant, despite waivers from all defendants. Concerned that should the prosecution's evidence necessitate any defendant's testimony against another at the instant trial or any subsequent trial, a vigorous cross-examination would be required, the Court noted that counsel "would [be] unable ethically to provide that cross-examination." Id. at 164.

1.7(b), the lawyer could not undertake that representation unless the lawyer reasonably believed that the representation of the litigation client would not be adversely affected by these limitations, and the litigation client (but only that client) consented after consultation.

**Imputation**

If, in a given instance, a lawyer has a disqualifying conflict, under Rule 1.7(a) or 1.7(b), is that disqualification necessarily attributed to all of the lawyer's colleagues as well? The answer, under Rule 1.10[15] is inescapably clear: any disqualification under Rule 1.7 is so imputed. Thus, if the lawyer must decline the litigation representation, because of the certainty that the representation will require adverse examination or discovery of another client, to which that client will not consent, no associated lawyer may undertake the representation in that lawyer's stead. Similarly, if the lawyer is already handling the litigation before the lawyer proposes to undertake representation of the witness, adverseness under Rule 1.7 would preclude not only the lawyer but the lawyer's colleagues as well from taking on the new employment. It will, to be sure, sometimes be the case that consent will be forthcoming in exchange for an undertaking that the particular lawyer or lawyers in a firm who have had, or who are going to have, direct dealings with the client-witness will not be involved in the representation.[16]

Declining or Withdrawing from Representation

Where one of the two representations is prospective only, and conflict is clearly foreseeable, then the solution, absent client consent, is clear enough: the prospective engagement must be declined. The solution may not be so simple, however, in a case where the conflict arises, or becomes foreseeable, only after both representations are well under way. Withdrawal from representation is an obvious possibility; but the harder question is, from which representation? Priority in time of the commencement of the representation is ordinarily likely to be given primary weight, yet the balance of equities, in terms of prejudice resulting from withdrawal, may well tilt strongly the other way. There are possible circumstances, for example, where it would be partic-

---

15. See note 4 supra.

16. On the imputation question, compare Bobkoski v. Board of Education (unreported), No. 90C5737 (N.D.Ill. April 12, 1991) 1991 WL 61052 (where one partner would have to cross-examine a former client as a fact witness, and no institutional mechanisms were in place to insulate against flow of confidential information, the entire firm was disqualified), reconsideration denied, 1991 WL 140150 (July 23, 1991), with Swanson v. Wabash, Inc., 585 F.Supp. 1094 (N.D.Ill.1984) (where one of the defense attorneys had represented potential witness for plaintiff but other attorneys at his firm submitted affidavits denying receipt of confidential information and stating that defendants had waived their right to have their attorneys cross-examine the particular witness, the court denied disqualification of the firm but issued protective order barring future disclosure of witness's confidences; the court noted that the co-defendants' attorneys were available to conduct the cross-examination).

ularly unfair to the litigation client to require it to choose between forgoing cross-examination of an important adverse witness, or discovery of an important third party witness, on the one hand, and replacing trial counsel after the litigation is long under way, on the other. In such circumstances, the desirability of some practical solution to the problem of the lawyer's (and the lawyer's colleagues') conflicting loyalties, and the more fundamental problem of the conflicting interests of the two clients involved, is patent. In some instances, a sufficient solution may be to provide for other counsel, also representing the litigation client, to deal with the client-witness: where local counsel as well as principal counsel are involved in a litigation, the disqualification applying to one of these will not ordinarily affect the other.[17] In other circumstances, a satisfactory solution may be the retention of another lawyer solely for the purpose of examining the principal lawyer's client.[18]

---

17. The general rule is that a co-counsel relationship will not in and of itself require disqualification. See Akerly v. Red Barn System, Inc., 551 F.2d 539 (3d Cir.1977) (refusing to disqualify main counsel following the disqualification of his local counsel); American Can Co. v. Citrus Feed Co., 436 F.2d 1125 (5th Cir.1971) (reversing trial court order imputing local counsel's disqualification to a co-counsel firm serving as trial counsel).

18. This is a possibility suggested in Jeffers, 520 F.2d at 1266.