UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DANIEL J. EDELMAN, INC.<br>    Petitioner,<br>v.<br><br>PRIME, LLC,<br>    Respondent. | Case No. 1:25-cv-11070<br><br>Honorable Georgia N. Alexakis |

**PRIME, LLC'S RESPONSE IN OPPOSITION TO DANIEL J. EDELMAN, INC.'S MOTION TO QUASH DOCUMENT AND DEPOSITION SUBPOENAS**

Prime Hydration, LLC ("Prime"), by and through its undersigned counsel, hereby submits its response in opposition to Daniel J. Edelman, Inc.'s ("Edelman") Motion to Quash Document and Deposition Subpoenas [2] and supporting Memorandum of Law [3] (the "Motion"), and states:

**INTRODUCTION**

Prime, a company that sells hydration and energy drinks, has achieved tremendous brand recognition and success following the company's launch in 2022. Mark Anthony International SRL ("Mark Anthony") is a company that has traditionally sold alcoholic beverages. In June 2024, facing a declining alcoholic beverage market, Mark Anthony decided to enter the hydration and energy drink market and launched its MÁS+ BY MESSI hydration drink.

Prime and Mark Anthony are embroiled in a lawsuit in the United States District Court for the Southern District of New York (the "Underlying Litigation"). In that litigation, Prime has alleged that Mark Anthony's MÁS+ BY MESSI products infringe on Prime's trademarks and trade dress. Specifically, Prime claims that Mark Anthony intentionally copied the trade dress of Prime and used similar language and branding, with the intent of confusing customers into believing that the two products were part of the same family, as seen below:



(*See* Prime's Amended Counterclaims in the Underlying Litigation, Ex. 1, at ¶ 87).

Edelman is a global communications and public relations firm that Mark Anthony consulted with in anticipation of the launch of its MÁS+ BY MESSI product line. Edelman assisted Mark Anthony in generating and analyzing press and media coverage surrounding the launch. Edelman also developed a "crisis preparedness" plan, which it created in anticipation of potential claims of Mark Anthony's infringement on Prime's trademarks and trade dress.

Edelman's pre-launch involvement in developing this "crisis preparedness" plan is a central issue in the Underlying Litigation. Prime alleges that Mark Anthony's actions were willful, intentional, and deliberate. As such, information about Edelman's work in supporting the launch of the product—including this "crisis preparedness" plan and anticipating trademark infringement allegations—is highly relevant to the parties' claims and defenses in the Underlying Litigation.

Following party discovery, whereby Mark Anthony produced numerous documents about Edelman's extensive involvement in these pre-launch efforts,[1] Prime sought to obtain documents

---

[1] Prime intended to attach to this response an email Mark Anthony produced in the Underlying Litigation. One of Edelman's employees sent an email to Mark Anthony's president following the product launch, which reflects Edelman's intimate involvement in the pre-launch strategy and

directly from Edelman. Prime's lead counsel in the Underlying Litigation is Greenberg Traurig, LLP ("GT"). Because GT attorneys who are not involved in this litigation provided legal services to Edelman in other, unrelated matters, GT initially asked Edelman, informally, whether Edelman would voluntarily produce the requested documents without the need for service of a subpoena.

Based on their initial discussions with an Edelman in-house attorney, GT was under the impression that the company would informally accept service of the subpoena and work collaboratively with GT to produce responsive documents. Several weeks later, however, an outside attorney for Edelman interjected and indicated that Edelman would not be working collaboratively to produce responsive documents, and that Edelman would not waive any potential conflict of interest that existed with respect to GT's efforts to obtain these documents from Edelman, in light of the firm's representation of this client in other unrelated matters.

When Edleman's outside counsel made this position clear, Prime immediately retained the undersigned law firm, Stumphauzer Kolaya Nadler & Sloman, PLLC ("Stumphauzer), to pursue a subpoena for documents and a subpoena for deposition directed to Edelman (the "Subpoenas"). Prime has offered to minimize any potential burden on Edelman in obtaining the documents and testimony required by the Subpoenas. Edelman, however, has steadfastly refused to turn over *any* documents or produce a witness for a deposition, baldly suggesting that any conflict on the part of

---

supports Prime's claims that Mark Anthony intentionally infringed Prime's trademarks and trade dress. Because Mark Anthony designated the email as "confidential" in the Underlying Litigation, Prime asked Edelman and Mark Anthony whether they would consent to Prime filing that document in this case under seal. Mark Anthony—understandably wanting to shield that document from this Court in connection with its consideration of the Motion—indicated that it considered Prime's request to file the document under seal to be a violation of the protective order in the Underlying Litigation. It further indicated that Mark Anthony was "not given sufficient time to consider Prime's request and not given sufficient information about the purpose of the disclosure." In an effort to avoid needless litigation over ancillary issues, Prime agreed to exclude that email from this filing for the time being, but intends to revisit the issue.

GT is automatically imputed to Stumphauzer, and that no set of limitations would avoid the undue burden that would result from Edelman having to produce documents or sit for a limited deposition.

Edelman's arguments should be rejected, and its Motion denied. Stumphauzer has not received any confidential information about Edelman. Moreover, after GT learned that Edelman would be taking the position that the GT lawyers could not be involved in seeking documents or testimony from Edelman, the GT lawyers have not directed the strategy or actions of or otherwise assisted the Stumphauzer lawyers in pursuing the Subpoenas. As a result, any potential conflict that might prevent GT from pursuing the Subpoenas cannot be imputed to Stumphauzer.

Moreover, Edelman's arguments about whether the Subpoenas exceed the scope of permissible discovery in the Underlying Litigation are wrong, factually, and unsupported, legally. And Edelman's suppositions about the undue burden the Subpoenas might impose on it are insufficient to support its request for relief. As a result, the Motion should be denied.

## MEMORANDUM OF LAW

### I. Edelman has not established any basis for the disqualification of Stumphauzer.

Edelman pejoratively describes the undersigned law firm as a mere "puppet" for GT and, therefore, seeks to disqualify Stumphauzer from representing Prime. As explained below, Edelman does not come close to carrying its heavy burden to obtain the firm's disqualification.

The disqualification of a party's attorney is "a drastic measure which courts should hesitate to impose except when absolutely necessary." *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993). "In addition to creating unnecessary delay, disqualification often deprives a party of its chosen legal advisor." *Guillen v. City of Chicago*, 956 F. Supp. 1416, 1421 (N.D. Ill. 1997). As a result, motions seeking the disqualification of a lawyer "should be viewed with extreme caution for they can be misused as techniques of harassment." *Id.* (quoting *Freeman v. Chicago Musical*

*Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982).

When analyzing a disqualification motion, courts employ a two-step analysis. First, the court must determine "whether an ethical violation has actually occurred." *Guillen*, 956 F. Supp. at 1421. Second, the Court must assess whether "disqualification is the appropriate remedy." *Id*. "The burden is on the moving party to ***show facts necessitating disqualification***." *Id*. (emphasis added). Edelman's Motion falls well short on both fronts.

**A. There are no facts suggesting that Stumphauzer committed an ethical violation.**

Courts should not disqualify an attorney unless there is a substantial basis for believing that "*actual*, rather than merely potential, conflicts of interest are afoot." *Id*. Here, Edelman simply hypothesizes that potential conflicts may exist. Although GT may be limited in pursuing discovery from Edelman, Prime's retention of Stumphauzer as conflicts counsel for the express purpose of pursuing this non-party discovery eliminates any potential conflict.

Without any evidence of an actual conflict, Edelman speculates that there might be impropriety, suggesting that Stumphauzer is nothing more than a "puppet" for the GT lawyers. *See* Motion at 8, 9, and 10 n.3. Edelman bases this presumption on Stumphauzer's issuance of a subpoena that is similar to the one GT initially drafted, and scheduling a deposition to occur at GT's office in Chicago. Motion at 8-9. This is the exact type of hypothetical, "potential" conflict of interest that is insufficient to compel disqualification. *See Guillen*, 956 F. Supp. at 1423.

Stumphauzer issued a similar subpoena to the one GT initially shared with Edelman because that subpoena encompassed the categories of documents Prime is seeking from Edelman related to its work for Mark Anthony. It would be a ridiculous undertaking for Stumphauzer to redraft that subpoena, re-order the document requests, or make other minor edits in an effort to

- 5 -

placate Edelman.[2] Furthermore, Stumphauzer—which is acting as conflicts counsel for Prime—does not have an office in Chicago, whereas GT (which continues to act as lead counsel for Prime in the Underlying Litigation) does. The mere scheduling of a deposition at the office of the firm whose ongoing representation of Edelman in entirely unrelated matters necessitated Stumphauzer's engagement as conflicts counsel falls well short of an "actual" conflict of interest.

Indeed, no ethical violation—or anything remotely approaching one—has occurred. This is supported by the sworn declaration from Stumphauzer attorney, Timothy A. Kolaya ("Kolaya Declaration") (Ex. 2). As described therein, the communications between GT and Stumphauzer regarding this matter have been limited to: (a) providing a general overview of the Underlying Litigation (Kolaya Dec. at ¶ 4); (b) explaining GT's representation of Edelman in an unrelated matter, which is why Prime engaged Stumphauzer as conflicts counsel for the limited purpose of pursuing the Edelman Subpoenas (*Id*. at ¶ 5); (c) providing Stumphauzer with access to documents Prime obtained in party discovery, which include documents relating to Edelman and its involvement in the MÁS+ BY MESSI launch (*Id*. at ¶ 7); and (d) sharing the drafts of the subpoenas that GT initially provided to Edelman through informal means (*Id*. at ¶ 8).

Thus, the only information Stumphauzer received from GT about Edelman was generalized and narrowly presented for the limited purpose of allowing Stumphauzer to proceed in its role as conflicts counsel. This non-confidential information is not the sort of information courts

---

[2] Edelman refers to a Bar Opinion regarding a law firm's issuance of a subpoena to its current client. Motion at 9 (citing NY Formal Op. 2017-6 at 6). The New York City Bar has explained the potential issues associated with a law firm "pass[ing] along to conflicts counsel an already drafted subpoena, or otherwise direct[ing] or influenc[ing] conflicts counsel from behind the scenes." *Id*. That is not even close to what occurred here. It was only after Edelman's outside counsel made clear it was not waiving any potential conflict when Stumphauzer proceeded with finalizing and serving the Subpoenas through formal channels. And, as described herein, GT is not involved in directing or influencing Stumphauzer's actions in pursuing these Subpoenas.

throughout this country have deemed worthy of disqualification. *See, e.g., Brandywine Commc'ns Techs., LLC v. Centurytel Broadband Servs., LLC*, No. 6:12-CV-286, 2013 WL 12159502, at *2 (M.D. Fla. Jan. 28, 2013) (denying motion to disqualify co-counsel where "there [was] no evidence that any confidential information was shared"); *Tennessee Bonding Co. v. Tennessee Ass'n of Pro. Bail Agents*, No. 3:24-CV-01325, 2025 WL 1921655, at *8 (M.D. Tenn. July 11, 2025) (holding that "a co-counsel relationship does not warrant imputed disqualification, at least absent disclosure of confidential client information between the co-counsel"). Because Stumphauzer has not engaged in any ethical violation, the Court should not disqualify the firm as Prime's counsel.

**B. Disqualification of Stumphauzer is not an appropriate remedy.**

Turning to the second prong, disqualification of Stumphauzer would not be an appropriate remedy. A decision to disqualify Stumphauzer from serving as conflicts counsel would prejudice Prime and set a dangerous precedent that would prevent litigants from obtaining discovery from non-parties due to technical conflicts. *See Am. Can Co. v. Citrus Feed Co.*, 436 F.2d 1125, 1129 (5th Cir. 1971) (noting that resorting to "so drastic a measure" as disqualification of co-counsel "would not only be unwise, but would also set a disturbing precedent" as "imputation and consequent disqualification could continue ad infinitum."). Under Edelman's proposal, no other law firm could ever seek non-party discovery from it in the Underlying Litigation, short of GT completely withdrawing from its representation of Prime. It cannot be that Edelman is forever immune from non-party discovery in this case solely because Prime's lead counsel, GT, has represented Edelman in other unrelated matters. But that is the precise relief Edelman is requesting. Disqualification of Stumphauzer as conflicts counsel for Prime would create the exact type of "imputation and consequent disqualification" carousel the Fifth Circuit has warned against. *Id.*

Edelman's proposal is even more egregious when considering that Stumphauzer is an

*entirely different firm* than GT. In its desire to avoid responding to the Subpoenas, Edelman suggests that the Court take the position that co-counsel—a different set of attorneys at a different law firm—have imputed knowledge merely because of the fact that GT, as lead counsel, is responsible for overall strategy recommendations in its representation of Prime. This would be an absurd result, which the Court should reject. Rather, this Court—like numerous other courts presented with similar situations—should conclude that conflicts applicable to attorneys at one law firm are not automatically imputed to another set of attorneys representing that same client. *See, e.g., Brandywine*, 2013 WL 12159502, at *2 ("[i]mputing knowledge to an attorney who acts as co-counsel from another attorney in a separate firm who himself possessed only imputed knowledge would result in unnecessary disqualifications"); *Baybrook Homes, Inc. v. Banyan Const. & Development, Inc.*, 991 F.Supp. 1440, 1446 (M.D. Fla. 1997) ("Where courts have imputed disqualification inter-firm, they have tended to do so by assuming or concluding that an attorney directly involved in the litigation has actual knowledge of the confidences. . . [T]his Court [has not] discovered any case imputing an imputed disqualification between separate firms . . .").

As the party seeking disqualification, Edelman has fallen well short of carrying its "heavy burden." *Guillen*, 956 F. Supp. at 1423. Where, as here, there is no indication that conflicts counsel has obtained confidential information from the non-party, and no evidence that the potentially conflicted lead counsel is directing the actions of conflicts counsel, the Court should refrain from ordering disqualification. *Id.*; *Freeman*, 689 F.2d at 722; *Fish*, 2012 WL 3643829, at *4.

**II. Prime is authorized to pursue the Subpoenas and has offered reasonable accommodations to avoid imposing an undue burden on Edelman.**

**A. The trial court authorized the parties to complete this and other pending discovery.**

Edelman asks the Court to quash the Subpoenas on the basis that they are untimely and provided Edelman with insufficient time to respond. Through additional conferral efforts, Edelman

has further suggested that this non-party discovery might exceed the permissible number of depositions in the Underlying Litigation. These arguments fail to acknowledge the reason why Stumphauzer's issuance of the Subpoenas on behalf of Prime was delayed, and are based on incorrect assumptions. Edelman's arguments also ignore a recent ruling in the Underlying Litigation that permits this (and other) discovery to proceed, as well as Prime's multiple offers to provide numerous accommodations to Edelman in connection with responding to the Subpoenas.

On July 1, 2025—more than three months before the close of discovery—the GT attorneys representing Prime sent an email to Edelman with copies of a subpoena for documents and a subpoena for deposition. (*See* conferral email, Ex. 3, at 12). Because the firm represented Edelman on other unrelated matters, a GT attorney had already spoken with an in-house attorney at Edelman to discuss whether Edelman would respond to the subpoenas through an informal process. The GT attorneys documented this understanding in an email to Edelman, noting what they understood to be an agreement to accept service and to produce responsive documents. (*Id.*).

After nearly two weeks with no response to the email, an outside attorney for Edelman appeared and advised the GT attorneys that there was "some confusion" regarding Edelman's agreement to accept the subpoenas. (*Id.* at 10-11) Nevertheless, Edelman's counsel confirmed her agreement to accept a subpoena for documents, provided Prime would agree to provide Edelman with an additional 14 days to respond with any objections. Of course, Prime agreed. (*Id.*)

On July 31, 2025, at the conclusion of the 14-day extension, Edelman's counsel served boilerplate, blanket objections to the subpoena for documents. (*Id.* at 8). Edelman's counsel also indicated that she would be on vacation for the next 10 days, and that any conference to discuss these objections could not occur until the week of August 11. (*Id.*). More than a week later, on August 19, 2025, the parties still had not connected for their conference, as Edelman's counsel

indicated that she was looking further into the issue of whether Edelman waived any potential conflict or otherwise agreed to accept and respond to the subpoena. (*Id.* at 4). Edelman's counsel confirmed, however, that she would respond as soon as she could on this important matter. (*Id.*)

Eight days later, on August 27, 2025, the GT lawyers followed up once again, asking Edelman's counsel for the company's position on whether it would respond to the subpoena. (*Id.* at 3). It was not until another week later, on September 3, 2025, when Edelman's counsel finally responded that Edelman *would not* waive any potential conflict involving GT's request for Edelman to accept and respond to the subpoena and, therefore, the subpoena "needs to be withdrawn, and no further action should be taken by GT" with respect to the subpoena. (*Id.*)

When Edelman finally made its position known that it would not cooperate in responding to the subpoena, more than two months had already passed since the time the GT lawyers initially provided the subpoenas to Edelman. Because pretrial deadlines were nearing, the GT attorneys reached out to Stumphauzer that very same day and requested whether Stumphauzer could assist Prime in pursuing these non-party subpoenas directed to Edelman.

Seeking to avoid any additional delay, undersigned counsel for Prime immediately proceeded with issuing the Subpoenas on Thursday, September 4, 2025, and was able to obtain service on Edelman on Monday, September 8, 2025. The discovery cutoff deadline in the Underlying Litigation was September 12, 2025. As a result, Prime requested that Edelman produce responsive documents by the discovery cutoff date of September 12, 2025.

At that same time, Prime was seeking relief in the Underlying Litigation to extend the discovery deadline so that the parties could finalize certain outstanding discovery matters, including discovery directed to non-parties. On September 4, 2025, Prime filed a letter motion seeking this relief. (Ex. 4). One of the limited discovery issues that was pending as of that time

was Prime's subpoenas to Edelman. Specifically, Prime identified the following discovery issue:

> On July 3, Prime also issued document and deposition subpoenas to a public relations firm that, according to late production and testimony from Mark Anthony's witnesses, has still more information directly bearing on Mark Anthony's knowledge of the similarities between Prime and Mas+ to which Mark Anthony's witnesses cannot directly testify. Prime has offered to work with the firm to try to minimize its burden, but the firm has not yet produced documents or made itself available for deposition. Again, it is not realistically possible to resolve these issues before the September 12 fact discovery deadline.

(*Id*. at 3). This reference to a "public relations firm" was a reference to Edelman.

In its ruling on that motion, the court in the Underlying Litigation declined to extend the discovery deadline for all purposes, but acknowledged that "there are discrete open discovery items as to which additional time after September 12 will be needed, and it appears that the parties generally have made or are making arrangements to complete discovery promptly with respect to those items." (*See* Ex. 5). The trial court further explained that it "expects the parties to proceed with dispatch to complete the outstanding discovery items. The Court does not anticipate the need to resolve disputes as to these outstanding items, but if so, these can be resolved on an individualized basis." (*Id*.). In other words, the trial court expressly acknowledged that Prime could continue to pursue its pending discovery, including the Subpoenas to Edelman.

### B. Edelman's other objections to the Subpoenas lack factual or legal support.

During Prime's meet-and-confer efforts with Edelman related to this Motion, Edelman has suggested that the Subpoenas are improper because Prime has taken more than the ten depositions permitted under Fed. R. Civ. P. 30(a)(2)(A). Edelman is wrong on multiple fronts.

Under Rule 45, a non-party is permitted to object to a subpoena on certain enumerated grounds. *See* Fed. R. Civ. P. 45(3). Those grounds are limited to (1) failing to allow a reasonable time to comply, (2) requiring the person to comply beyond the permissible geographic limitations, (3) the disclosure of privileged or other protected matter, or (4) undue burden. *Id*. In other words,

Rule 45 does not permit a non-party, like Edelman, to object due to technical issues such as when the deposition is occurring in relation to the case deadlines, how many depositions the parties have taken, or other matters that may be in dispute between the parties to the case.

Rather, those are issues for the parties to the case to address. One would assume that if Prime was impermissibly taking this deposition beyond the deadlines in the Underlying Litigation or such that the deposition of Edelman would exceed the number of permissible depositions, Mark Anthony, the other party in the Underlying Litigation, would have appeared in this action and objected on those grounds. But, unsurprisingly, that has not occurred.

That is because Edelman is mistaken about the number of depositions Prime has taken in the Underlying Litigation. Prime has only taken nine (9) depositions. As a result, Prime's deposition of Edelman would be its *tenth* deposition and, therefore, within the number permitted in the Underlying Litigation. Moreover, the trial court already authorized Prime to "proceed with dispatch to complete the outstanding discovery items," including the Subpoenas to Edelman. (Ex. 5). And, notwithstanding the original return dates on the Subpoenas, Prime has indicated its willingness to afford Edelman a reasonable amount of time to collect and produce responsive documents, and is open to rescheduling the deposition for a mutually agreeable date.

As a result, the Court should reject these late-developed arguments Edelman has interjected through the parties' conferral efforts. Additionally, given that Mark Anthony has not objected to the Edelman Subpoenas, there is no need for this Court to transfer the Motion to the Southern District of New York for a determination about whether the Subpoenas are permissible under the court's orders in the Underlying Litigation. Rather, this Court is more than adequately equipped to address the burden issues Edelman has raised, which are discussed in further detail below.

**C. Prime has offered reasonable accommodations to narrowly tailor the scope of the Subpoenas in an effort to minimize any potential burden on Edelman.**

Edelman argues it should not be required to respond to the Subpoenas because that process would result in undue burden to a non-party. To be sure, the status of a recipient of a subpoena as a non-party is a factor courts consider in weighing the burden. *See Donald v. City of Chicago*, No. 20 C 6815, 2022 WL 2802322, at *1 (N.D. Ill. July 18, 2022). Non-parties are afforded this consideration because courts impose a different set of expectations for parties and non-parties regarding the efforts they must undertake related to ongoing litigation. *Id.* Ultimately, "the decision to quash a subpoena lies within the extremely broad discretion of the district court" and, "[i]n exercising that discretion, the concept of relevance plays a critical and indispensable role." *Id.*

A non-party may not, however, simply use the buzz words "undue burden" and avoid the obligation to respond to a subpoena. Rather, a non-party is "required to present affirmative proof, not simply bald assertions, of the burden." *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 13-1054, 2014 WL 12733590, at *3 (C.D. Ill. Jan. 8, 2014) (citations omitted); s*ee also Langen v. Wells Fargo Bank, N.A.*, No. 11-CV-3369, 2012 WL 4473305, at *3 (C.D. Ill. Sept. 26, 2012). Although Edelman will be required to undertake some amount of work in responding to the Subpoenas, Edelman has not come close to establishing undue burden.

In an effort to address Edelman's stated concerns, Prime has made numerous offers to reduce any potential burden on Edelman. During a meet and confer discussion with counsel for Edelman on September 19, 2025, Prime agreed to limit the scope of the Subpoena to documents Prime could not obtain through party discovery. In other words, Edelman can exclude any external communications between Edelman and Mark Anthony, and thereby limit its production to internal documents involving its work on the product launch. Prime also agreed that Edelman could limit its search efforts and production to the four-month period leading up to the product launch (*i.e.*, February through June 2024). In addition, Prime explained that it would be open to the application

of reasonable limitations through the use of custodians and search terms, which would further reduce the burden for Edelman in identifying potentially responsive documents.

In response to these accommodations, counsel for Edelman initially agreed to speak with her client to assess what responsive information it might have. Counsel further agreed to continue these conferral efforts. Despite these overtures, counsel for Edelman was unavailable for a follow-up phone conversation on multiple days throughout the following week and did not provide any substantive response regarding what documents the company would agree to search for and produce until September 26, 2025. (*See* conferral email dated September 26, 2025, Ex. 6).

In this communication, Edelman made clear that no set of limitations would be acceptable. Rather, Edelman continues to maintain that the Subpoenas are burdensome, a fishing expedition, and cumulative of party discovery. (*Id.*) And despite its repeated use of the phrase "undue burden," Edelman has not provided any detail whatsoever about why, and to what extent, any search would be burdensome. At the same time, Edelman speculates that it might not have any relevant materials to produce, notwithstanding that it has not actually reviewed the requested documents. (*Id*. at 2).

Edelman also suggests that requiring it to search for potentially responsive and relevant documents "is a search for a needle—that we have no reason to believe even exists—in a haystack." (*Id*. at 2). This is ironic, given Edelman's simultaneous acknowledgement that the party production from Mark Anthony, which encompasses approximately 150,000 pages, includes "somewhere around 17,000 pages related to services provided by Edelman." (*Id*. at 1). The fact that *more than ten percent* of Mark Anthony's total document production relates to Edelman's work on the product launch is remarkable. Clearly, Edelman's work for Mark Anthony is a material and central issue on which the parties have focused much of their litigation efforts. Although Edelman describes its own documents as a "haystack," Prime's right to review those documents is

clear. Prime is not looking for a needle; rather, it needs to analyze the composition of the hay itself.

Prime has limited the scope of the Subpoenas to internal Edelman documents pertaining to the marketing strategy and "crisis preparedness" plan it developed for Mark Anthony. These requests are not complex and do not require extensive analysis. Moreover, Prime has agreed to narrow this request to a four-month period, from February to June 2024. Given Prime's repeated offers to minimize the burden on Edelman, this is a situation where the lawyers "should be able to arrive at a mutually acceptable agreement without judicial intervention." *Donald*, 2022 WL 2802322, at *2 (denying motion to quash where "the matter [was] anything but complex and counsel should [have been] able to come to an agreement without hand-holding from the court."). Over the past *three months*, Prime has been extremely cognizant of reducing any burden on Edelman as it responds to the Subpoenas. In return, however, Edelman has delayed and introduced obstacles throughout the process. This is the exact type of conduct this Court has cautioned against:

> To their credit, the defendants have at least offered some workable solutions. [Non-party] and [his] counsel did not, preferring to issue an ultimatum instead . . . . That they made no attempt to compromise on this matter and avoid needlessly taking up the court's time with it is made ever clearer in their reply brief . . . . in short, what [non-party] has done here is not the type of good faith negotiating expected of attorneys and their clients to work out their discovery squabbles before filing discovery motions. [Non-party] and counsel should bear that in mind going forward.

*Donald*, 2022 WL 2802322, at *2 (cleaned up); *see also Gunn v. Stevens Security & Training Servs., Inc.*, 2018 WL 1737518, at *3 (N.D. Ill. 2018) ("A party that steadfastly maintains a position without support is not engaging in a good faith discussion."). The Court should deny the Motion, reject Edelman's stonewalling efforts, and require it to comply with the Subpoenas.

## CONCLUSION

Prime requests that the Court deny the Motion and require Edelman to produce documents that are responsive to the Subpoenas (as narrowed and limited by the agreement of Prime, as described herein) and, thereafter, produce a corporate representative for a deposition.

DATED: September 29, 2025 	Respectfully submitted,

**STUMPHAUZER KOLAYA NADLER & SLOMAN, PLLC**
Two South Biscayne Blvd., Suite 1600
Miami, FL 33131
Tel.: (305) 614-1400
Fax: (305) 614-1425

By: */s/ Timothy A. Kolaya*
TIMOTHY A. KOLAYA
*Admitted Pro Hac Vice*
tkolaya@sknlaw.com
MICHAEL B. NADLER
ARDC No. 6287832
mnadler@sknlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 29, 2025, I electronically filed the foregoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Timothy A. Kolaya*
TIMOTHY A. KOLAYA